# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARIA D. LUCERO,

        Plaintiff,

v.                                              No. CIV 05-110 LFG

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

       Plaintiff Maria D. Lucero ("Lucero") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Lucero was not eligible for disability insurance benefits ("DIB"). Lucero moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. No. 7.]

       Lucero was born on April 15, 1961 and was 42 years old when the administrative hearing was held. [RP at 31, 464.] She has a high school degree and two years of college, during which time she studied psychology. [RP at 69, 465.] After becoming pregnant with one her children, Lucero did not proceed with college. [RP at 465.] Lucero went to real estate school in 1987. [RP at 69.] She is married and has two children, ages 5 and 19. [RP at 212.]

Lucero's recitation of her employment history is somewhat imprecise.  In one form she stated that she worked as a telephone operator, office manager, or office marketer from about 1985 to 2002 [RP at 64]; in another, she wrote that she was in office management or office marketing from 1990-2002 [RP at 86].  Lucero also stated she worked for an insurance agency from 1992-1997, for another agency from 1997-1999, and at a third agency from May 1999 through early 2003.  [RP at 96, 127.]

Several of Lucero's prior employers wrote letters of support on her behalf.  Rick James stated that he hired Lucero in the Fall of 1998 and tried to keep her as an employee but had to let her go because her physical condition prevented her from doing the work.  [RP at 128.]  Another employer, Tony McCormick, wrote that Lucero worked for him from May 1999 until April 2003.  She began working a 20/hour week but by 2003, had to decrease her work to 10 hours or less every week.  [RP at 127.]  As of May 15, 2003, Lucero reported to a medical provider that she still was currently working for the electrical contractor, even though most other records indicate April 2003 was her last month of employment.[1]  [RP at 288.]

---

[1] Lucero's mental health counselor's notes indicate that Lucero worked as a waitress for 7 years, in the insurance field for 7 years, and as a "craps" dealer at Sandia casinos during some period of time.  [RP at 349.]  The therapist's handwritten notes, however, are not entirely clear with respect to what jobs Lucero held or the corresponding time frames for those jobs.  Lucero also worked a newspaper route, which involved heavy lifting. [RP at 174, 189.]

On December 11, 2002, Lucero filed her DIB application.  [RP at 48.]  She initially alleged that January 15, 1998 was the onset of her disabilities of osteoarthritis, hemochromatosis,[2] frequent phlebotomies, severe pain throughout her body and migraine headaches.  [RP at 48, 62-63.]  Lucero later amended her onset date of disability to August 2001.  [RP at 19, 169.]

Lucero's application for disability benefits was denied at the initial and reconsideration stages, and she sought timely review from the ALJ.  An administrative hearing was held on March 8, 2004.  [RP at 455.]  In a written decision, dated October 22, 2004, ALJ Carol A. Connor found that Lucero was not disabled within the meaning of the Social Security Act ("the Act") and denied her DIB application.  [RP at 19-25.]  Lucero challenged this determination to the Appeals Council which denied her request for review on December 7, 2004.  [RP at 7-8.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then

---

[2]Hemochromatosis is "a disorder of iron metabolism characterized by excess deposition of iron in the tissues, especially in the liver and pancreas, and by bronze pigmentation of the skin, cirrhosis, diabetes mellitus, and associated bone and joint changes."  Dorland's Illustrated Medical Dictionary, 26th ed., p. 593.  Plaintiff describes hemochromatosis as a "rare disease of iron metabolism" [Doc. No. 8, p. 2, fn. 1], but materials in the administrative record discuss it as being the most common genetic disease in the United States even though almost no one has heard of it.  [RP 133.]  Those materials also state that early warning signs of the disease can be heart disease or heart attack, liver disease, infertility, impotence or crushing fatigue – "the most common complaint."  In addition, the materials indicate that the disease is "highly treatable" and that once diagnosed, the patient undergoes periodic phlebotomies – "draining some iron-saturated blood to keep the iron from lodging in the vital organs. 'It's identical to giving blood.'"  How often a person is "drained" depends on how much iron she is taking up.  A reasonable estimate might be two to four times a year.  [RP at 134.]

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10]  If the Commissioner proves other work exists which the

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

4

claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]  Here, Judge Connor made the determination of non-disability at step four.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor reweigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

_____

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

5

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing Lucero's testimony, medical records, symptoms, and complaints, the ALJ rejected Lucero's claim for benefits at step four. Judge Connor concluded that Lucero's RFC did not preclude her from returning to her past relevant work as an office manager as she performed that occupation. [RP at 24.] In reaching this decision, the ALJ the following findings: (1) Lucero had not engaged in substantial gainful activity since the amended onset of disability; (2) Lucero had an impairment or combination of impairments considered "severe" but the severe impairments did not meet or medically equal any of the listed impairments; (3) Lucero's allegations regarding her limitations were not totally credible; (4) Lucero had the RFC to perform sedentary work activity and could lift or carry 10 pounds occasionally and less than 10 pounds frequently; she also could stand/walk at least 2 hours and sit 6 hours per day; she could occasionally climb, balance, stoop, kneel, crouch and crawl; (5) Lucero's past relevant work as an office manager did not require the performance of work-related activities precluded by her RFC; (6) and Lucero's osteoarthritis, C5-6, C6-7 and L4-5 disc bulging with radiculopathy, hemochromatosis, migraine headaches and depression did not prevent her from performing her past relevant work. [RP at 24-25.] Ultimately, Judge

Connor concluded that Lucero was not disabled as defined by the Social Security Act at any time through the date of the ALJ's decision. [RP at 25.]

## Summary of Lucero's Medical Care

Lucero's medical history is extensive and the medical records are voluminous. The records before the ALJ and thus, before the Court, demonstrate the existence of significant medical conditions and complaints.

Lucero began feeling fatigue and experiencing severe pain in about 1997, after the birth of her second child. [RP at 194, 228.] Her medical records, however, span only the years of 2001-2004. Lucero provided a typed summary of her prior medical history to one of her medical providers in 2001. [RP at 197.] The list indicated that her migraines and foot pain began in 1997, and that recommendations were made that she take anti-depressant medication. [RP at 197.] Lucero also had her gall bladder removed in 1997. She was diagnosed with bone spurs and treated with cortisone injections in 1997.

In 1998, Lucero saw a foot specialist who prescribed custom-made arch supports and recommended anti-depressants for fatigue and "all-around" pain. She was prescribed the narcotic pain medication, Hydrocodone, because Ibuprofen did not work. In 1999, her foot specialist concluded that a bunion was causing Lucero's chronic leg and ankle pain. As a result, she underwent a bunionectomy. In 2000, Lucero could not walk without limping. Her doctor recommended an arch-stretcher devise and pain medications. In 2000, Lucero had another surgery, this time an appendectomy. [RP at 197.] There are no medical records before 2001 documenting complaints or treatments relating to her appendix or other medical problems.

The medical records from 2001-2004, however, are extensive.  More often than not, Lucero saw doctors and therapists and/or had medical exams and procedures performed two to four times a month from 2001 through 2003.

### *2001 Medical Records*

On March 6, 2001, Lucero complained of pain in her feet, legs, and back.  She complained that her knee "collapsed" when she ran for the mail.  She told the medical provider that she rode an incumbent bike every other day.  [RP at 228-29.]  Dr. Dwight Burney examined Lucero's knee that day and recommended surgery, and on March 12, 2001, he performed an arthroscopy of the knee during which he removed some "loose bodies."  Lucero was not to work for four weeks.  [RP at 220, 228, 230.]  As of March 21, 2001, Lucero's knee was improved.  Dr. Burney recommended a rheumatology consultation with Dr. Leroy Pacheco for Lucero's multiple joint complaints.  [RP at 219.]

On April 3, 2001, Lucero saw Dr. Joseph Perea for pain, stiffness and fatigue that had its onset in 1997 after she gave birth to her second child.  Lucero reported that she could stand, walk, and sit for only 30 minutes.  After attending and observing a sports game, Lucero was unable to walk to her car in the parking lot.  She awoke three to four times each night because of pain.  She was tired and fatigued throughout the day.  [RP at 194.]  Lucero told Dr. Perea that she had seen a chiropractor and that her primary care physician ("PCP") prescribed Vioxx since he thought her problems might be related to arthritis.  Neither the chiropractic treatment nor the Vioxx helped.  Her test for arthritis was negative.

Lucero complained of chronic fatigue in 2001 and stated she had difficulty moving around in the mornings.  Even though she had knee surgery, her knee still "went out."  Lucero also

complained of ankle pain, "popping" in her hip and ankle joints, and numbness in the arms. [RP at 197.] Lucero stated that she had not been able to go any longer than two hours without food since her teenage years. Without food, she felt dizzy and faint. However, a test for diabetes had come back negative in the past. [RP at 197.]

On April 9, 2001, Lucero again saw Dr. Perea for arthralgias (pain in a joint) in her hips, hands, feet, and back. She again complained of pain and fatigue. The medical record also notes complaints of depression, coldness, and dry hands/feet. [RP at 190.] Dr. Perea speculated that Lucero might have early Rheumatoid Arthritis ("RA") and started her on a clinical trial of Armour thyroid medication even though her thyroid tests were normal. [RP at 188, 190.]

On May 8, 2001, Lucero told Dr. Perea that she was much better and not as fatigued. The Celebrex was helping greatly on the arthralgias; however, Lucero told Dr. Perea that she had a bad day today because she pulled some muscles lifting newspapers on her newspaper route. Dr. Perea intended to talk to Lucero's PCP, Dr. Evanko, because he wanted Lucero referred for a hematology evaluation. [RP at 189.]

On May 10, 2001, Dr. Perea wrote to Dr. Mark Evanko regarding Lucero's diagnosis of hemochromatosis. He explained to Dr. Evanko that he had seen Lucero for a rheumatology evaluation but that he was not a participating doctor for her health plan. Dr. Perea noted that Lucero's ferritin[12] levels were elevated. Because of the elevated ferritin, Lucero needed further hematology evaluation, a phlebotomy series, and an evaluation of her relatives for hemochromatosis. [RP at 188.]

---

[12]Ferritin is defined as "the iron-apoferritin complex, which is one of the chief forms in which iron is stored in the body. Dorland's Illustrated Medical Dictionary, 26th ed., p. 492.

On May 31, 2001, Dr. Perea gave Lucero a B-27 injection.  She continued to complain of fatigue and sleep problems.  Dr. Perea increased Lucero's thyroid medication.  Because Lucero was going to Disneyland at this time, she requested only the vitamin injection.  [RP at 186.]

On June 11, 2001, Lucero was seen by Dr. Douglas Clark of New Mexico Oncology, although this does not appear to have been her first visit to Dr. Clark, because the record indicates Lucero had had a phlebotomy 10 days prior to this date.  She had diagnoses of possible hemochromatosis and elevated ferritin, diffuse joint pain, and past history of elevated "LFT's.  Lucero returned for an assessment regarding her high iron level.  Repeat iron studies showed no change in Lucero's ferritin level and also showed a "highly saturated iron binding capacity," even after the phlebotomy.  Lucero had a syncope-like reaction[13] to the phlebotomy but recovered very quickly and felt "fair" since the episode.  Her musculoskeletal complaints remained the same.  Dr. Clark discussed hemochromatosis, other iron loading conditions and the symptoms of the disease.  Lucero did not have any nausea, the urge to vomit, constipation, diarrhea, melena, jaundice, hematuria or dysuria.  [RP at 176.]

On July 11, 2001, Dr. Pacheco wrote Dr. Evanko regarding an appointment Lucero had that day (although there is no corresponding medical record).  This was Lucero's first appointment with Dr. Pacheco.  Dr. Pacheco noted Lucero's complaints of increasing problems with arthralgias and some myalgias for the last 4 years.  Lucero reported to him that her problems had gotten progressively worse.  Her pain used to be limited to the ankle area but had moved into her hips and the back of her legs.  She also felt pain in her shoulders and hands.  Her knees still hurt, and she

---

[13]Syncope is defined as "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon."  Dorland's Illustrated Medical Dictionary, 26th ed., p. 1287.

suffered from wrist pain.  She told Dr. Pacheco that she worked as an office manager and also had

a paper route on the side to make extra money.  Dr. Pacheco noted that Lucero had tried Celebrex

and Vioxx with minimal relief.  Her stiffness in the morning lasted an hour and pain kept her awake

at night.  Dr. Pacheco's "review of systems" was notable for fatigue, weakness, complaints of fever,

nocturia, bruising, headaches, night sweats, and difficulty sleeping.  Lucero told the doctor that she

rode a bicycle four times each day.  Dr. Pacheco's exam revealed some early "Heberden's nodes."[14]

Dr. Pacheco did not find any significant tenderness or swelling.  Lucero showed some tenderness with

the Jobe's maneuver.  He stated in his letter that "We have a pleasant young woman with a recent

diagnosis of Hemochromatosis and evidence on exam of OA [osteoarthritis]."   Dr. Pacheco

concluded that Lucero had a bit more morning stiffness than he would expect for someone with OA.

He continued her use of non-steroidal medications but changed the dosages on certain medicines. He

referred her to physical therapy because he believed it should help with some of Lucero's symptoms.[15]

[RP at 250.]

On July 11, Lucero also saw Dr. Clark again for a follow-up on her hemochromatosis.  Dr.

Clark noted that even though they had started and completed six phlebotomies by this date, Lucero's

ferritin level had not decreased.  Lucero still complained of aches and pain.  [RP at 174.]  On July

23rd, Lucero reported to Dr. Perea that her arthritis was better but still painful at times.  She suffered

from bilateral shoulder pain that was "worse with her paper route work" and with rainy weather.

Lucero also felt pain in her left shoulder, "especially with the paper route."   Overall, Lucero felt

---

[14]Heberden's nodes are small hard nodules, formed usually a the distal interphalangeal articulations of the fingers, produced by calcific spurs of the articular cartilage and associated with interphalangeal osteoarthritis. Dorland's Illustrated Medical Dictionary, 26th ed., p. 897.

[15]Although Lucero testified at the ALJ hearing that she had undergone physical therapy, there are no physical therapy records in the administrative record.

increased energy.  Dr. Perea noted that Lucero was positive for Bouchard's nodes.[16]  Lucero felt her

increased energy was due to the thyroid medication.  [RP at 184.]

August 2001 is Lucero's revised onset date related to her disabilities.

On September 5, 2001, Lucero followed up with Dr. Pacheco.  She reported feeling a "little

better" but due to a move to a new residence, she experienced a significant increase in her OA

symptoms.  She complained of tingling and numbness over her fingers.  The pain radiated from

shoulders downward.  The doctor noted a persistent "Jobe's maneuver" in both shoulders.  Lucero

had a positive Tinel's sign[17] over both carpal tunnel areas.  Dr. Pacheco gave Lucero a steroid

injection in her shoulders.  He prescribed nothing for her elbow except ice.  She was to use wrist

splints over both hands if the pain did not improve, and Dr. Pacheco stated that he might order an

EMG study.  [RP at 249.]

On September 12, 2001, Lucero had an abdominal ultrasound apparently ordered to test her

hemochromatosis, but the test results were normal.  The radiologist indicated that a CT scan or MRI

would be more sensitive to detect hemochromatosis.  [RP at 201.]  On September 24th, Lucero saw

Dr. Clark related to her diagnosis of hemochromatosis.  Lucero complained of feeling poorly after

her last few phlebotomies and said she had skipped a procedure the last week.  However, the medical

record notes that her aches and pains had decreased since she started getting phlebotomies.  The

ferritin level had decreased significantly.  The ultrasound results indicated that there was no evidence

---

[16]Bouchard's nodes are cartilaginous and bony enlargements of the proximal interphalangeal joints of the fingers in degenerative joint disease.  Such nodules in the terminal interphalangeal joints are called Heberden's nodes.  Dorland's Illustrated Medical Dictionary, 26th ed., p. 897.

[17]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Dorland's Illustrated Medical Dictionary, 26th ed., p. 1206.

of any lesions in her liver.  Dr. Clark advised Lucero to continue trying to get phlebotomies on a weekly basis.  [RP at 170.]

On October 29, 2001, Lucero followed up with Dr. Pacheco for her shoulder and lower extremity pain.  The prior injections for rotator cuff tendinitis and use of splints for carpal tunnel syndrome ("CTS") had helped.  Lucero complained of pain across her shoulders in the trapezius area and pain over her feet bilaterally.  Again, she complained of excessive fatigue which she attributed to the phlebotomies.  Dr. Pacheco suspected a sleep disorder and wanted Lucero evaluated for a possible sleep problem, which he believed could account for a lot of her complaints.  [RP at 248.] The record does not show that Lucero followed up with this recommendation.

On October 30, 2001, Lucero saw Dr. Perea for a re-evaluation of her arthritis and thyroid function.  She complained of increased severe fatigue.  Lucero was feeling sleepy while driving and was afraid to drive.  She also complained of dizziness.  Lucero was getting a phlebotomy regularly but did not feel better.  She suffered from hot flashes now and complained that her arthritis had returned.  Lucero's anterior ankle was painful, and her neck muscles were sore and tired.  She reported that a steroid injection had helped.  Dr. Perea observed that Lucero appeared fatigued.  [RP at 182.]

On November 6, 2001, Lucero reported to Dr. Perea that she was feeling much better after having received the injections.  Although her fatigue was much better, it was still there.  Lucero's arthritis had not improved and she was unable to work out.  She complained of bone pain.  [RP at 180.]

13

### *2002 Medical Records*

Lucero received phlebotomies on the following dates in 2002:  1/18, 2/1, 2/15, 2/28, 4/5, 4/19, 4/26, 5/3, 5/21, 6/5, 6/21, 7/12, 7/31, 9/12, 10/1, 10/22, 11/13, 12/30.  [RP at 205.]  No other records presented document Lucero's phlebotomies or what occurred during the phlebotomies other than Lucero's reports to her physicians.

On May 24, 2002, Lucero had a bilateral hand x-ray due to her claim of joint pain.  Both hands were normal.  [RP at 200, 247.]  On June 14, 2002, Lucero had a follow up visit with Dr. Pacheco for arthritis.  She complained of pain in the left lateral epicondyle area and her left heel.  Her pain had increased recently.  She informed Dr. Pacheco that Dr. Evanko declined her request to give her an injection for pain. (Dr. Evanko's records do not mention this.)  Dr. Pacheco did not advise injecting the Achilles tendon due to risk of rupture but he recommended giving Lucero a "steroid burst" and an increased dose of non-steroidals before doing an epicondylar injection.  [RP at 245.]

On August 8, 2002, Lucero saw a psychologist.  She reported obtaining more arthritis medications and a muscle relaxant to help her sleep at night.  She felt "pretty good" physically.  [RP at 278.]

On September 5, 2002, Lucero returned to see Dr. Pacheco relating to her history of OA and tendinitis.  She complained of pain in her left knee.  Although she did not recall injuring her knee, it had been locking up, giving way and causing pain.  Lucero was wearing a knee brace.  Dr. Pacheco referred her for an MRI of the knee.  He noted that her history of hemochromatosis would probably make Lucero's cartilage more brittle and more susceptible to developing problems.  Lucero indicated that she had had some benefit from the Flexeril.  [RP at 244.]

On September 11, 2002, Lucero had another x-ray of her left ankle related to complaints of pain. A small spur was noted. [RP at 274, 344.]

On September 16, 2002, Lucero saw her counselor again. She stated that she was "feeling good." She had started to do the household chores again. The therapist's note indicates that Lucero's "maturity level" was "growing" and that she was not living in a fantasy world anymore. [RP at 278.]

On September 19, 2002, Lucero had an x-ray/MRI of her left knee due to her complaints that her knee was locking and causing pain. The radiologist did not see any meniscal tear. There was a small area of osteochondral irregularity and a small "new area" cartilage injury. [RP at 242.]

On September 20, 2002, Lucero followed up with Dr. Evanko.[18] Lucero had not filled her prescription for Prednisone yet. She continued to complain of pain and soreness in her ankle. Dr. Evanko apparently planned to send her back to Dr. Pacheco. The medical note, however, is difficult to read. [RP at 273.]

On September 26, 2002, Dr. Pacheco saw Lucero for complaints of pain in her knee and ankle. Her ankles were more swollen and Lucero said that she had difficulty even when wearing the knee brace. She continued to complain of knee pain bilaterally. The MRI was performed, and although Dr. Pacheco had suspected a meniscal tear, none was found. The MRI results were consistent with osteoarthritis. Lucero had tenderness around the knees and ankle. Dr. Pacheco felt her knee problems were related to osteoarthritis. He also thought that Lucero probably had tears of some tendons or ligaments in her feet. He referred her for an MRI of her ankle and for authorization

_____

[18]This is the first medical record in the administrative record that the Court located from treating physician Dr. Evanko. It is clear, however, that Lucero had been seeing Dr. Evanko before this date. The few medical records from visits with Dr. Evanko are cursory and difficult to read. [RP at 266-69, 273.]

to be injected in the knee with Hyalgan, noting that Lucero had not responded well to non-steroidal medications.  [RP at 241.]

On October 11, 2002, Lucero again saw Dr. Pacheco relating to the MRI of her ankle and the injection.  The medical record notes that she was "feeling about the same overall with no acute complaints."  The MRI of the knee (sic) demonstrated multiple areas of abnormal signal, suggesting either edema or contusion, and there was some question raised as to a possible incomplete fracture. Dr. Pacheco was not sure what to conclude from the abnormal MRI of the ankle and recommended she see an orthopedist.  Dr. Pacheco gave Lucero injections into her knees.  She experienced what appeared to be a vasovagal reaction with brief nausea, sweats and lightheadedness.  However, Lucero seemed better within minutes.  [RP at 240.]

On October 14, Lucero saw here therapist again, although little is mentioned in the record. On October 18, Lucero received her second injection into the knees.  She was doing fine and had not had any problems.  [RP at 278, 239.]  Her third injection to the knees occurred on October 25th, and Lucero reported that her knees felt better.  [RP at 238.].

On October 31, 2002, Lucero visited Dr. Pacheco again for knee injections.  She complained of mild mid-back pain.  She was having no problems related to the injections.  The doctor noted myofascial pain and OA of knees.  Lucero declined physical therapy.  Dr. Pacheco was reluctant to change her muscle relaxant at time.  [RP at 237.]

On November 2, 2002, Lucero filed her Disability Adult Report.  [RP at 62.]  She alleged that OA and hemochromatosis limited her ability to work, along with severe pain throughout body.  When she was "phlebotomised," she was unable to work the rest of day.  Lucero also complained of migraine headaches and stated that these illnesses first bothered her on January 15, 1998, but that she

16

was unable to work as of May 1, 1999 [RP at 63.]  Lucero felt severe pain in her hands from computer work and pain in her neck and spine.

Lucero's illnesses forced her to work fewer hours.  She was unable to work full-time in the insurance office because she could not sit or stand longer than 1.5 hours.  Lucero had dropped her hours down to 25 per week and at this time tried to work 6-10 hours/week.  However, she stated she was unable to do the work.[19]  Lucero described her prior office manager work as requiring sitting for 8 hours and no standing or reaching.  She wrote for 8 hours and lifted less than 10 lbs occasionally and/or frequently.  [RP at 64.]

Lucero was taking a number of medications then, including Butalbital[20] for migraines, Hydrocodone for pain, Celebrex for arthritis pain, Doxycycline for inflamation, and "Colchcine" for arthritis.  Some of the medications made her sleepy [RP at 68.]  Lucero was having phlebotomies every 3 weeks then and stated she would need them for the rest of her life.  [RP at 71.]

On November 5, 2002, Lucero saw Dr. Dwight Burney of New Mexico Orthopedic Associates.  Dr. Burney had not seen Lucero in the last year and a half.  Dr. Burney noted that Lucero had undergone arthroscopic surgery to her right knee for loose body removal and chondral lesion in March 2001.  He had suspected Lucero might have inflammatory arthritis then.  Lucero's synovial biopsy was normal, and Lucero was referred to Dr. Pacheco for an arthritic evaluation.  Dr. Pacheco diagnosed Lucero with OA.  She had received Hyalgan injections to the knees.  She complained of pain in her left ankle and was concerned because she was unable to maintain her

---

[19]Based on her employer's note, Lucero continued to work about 10 hours per week until or through April 2003.  In addition, according to the note, Lucero began working for this employer for 20 hours per week.  [RP at 127.]

[20]Short to intermediate acting barbituate with muscle relaxing qualities.  <u>Physicians Desk Reference</u>, 2052 (48th ed. 1994).

normal level of activity.  The progress note indicates that Lucero enjoyed working out in the gym.  Dr. Burney believed Lucero had subtalar arthritis of her left ankle, and he injected the subtalar joint.  Dr. Burney advised Lucero that if the injection did not relieve the pain for long, he would consider referring her to Dr. Johnson for subtalar fusion (or surgery).  [RP at 214.]

On November 11, 2002, Lucero again saw her therapist and complained to him that she was hurting from arthritis.  Lucero asked for additional therapeutic sessions to deal with her pain and stress.  The therapist thought she might benefit from more sessions.  [RP at 278.]

Lucero also saw Dr. Pacheco on November 11th.  She received her fifth Hyalgan injection to the knee.  Her knee was doing well then, but Lucero reported problems with her left hand.  Lucero denied any new complaints but stated that her fingers locked up at times.  Dr. Pacheco assessed Lucero with OA of the knee, myofascial pain, and flexor tenosynovitis.  [RP at 236.]

On November 13, 2002, Lucero saw Dr. William D. Zolin with Hematology-Oncology Associates at St. Joseph Square.  The record indicates that Lucero had returned 3 ½ months after her last visit.  She had hereditary hemochromatosis and had undergone 17 phlebotomies that year.  Dr. Zolin noted that Lucero's hemoglobin managed to stay above 13 gm% on phlebotomy every 21 days.  Her serum iron and TIBC were still abnormal but the ferritin was slowly decreasing.  The record also documented that Lucero was receiving injections into her knee because of arthritic pain and was scheduled for a left ankle fusion by Dr. Burney.  The osteopath felt that her arthritis was not related to hemochromatosis but rather to OA.  Dr. Zolin observed that Lucero "rises on and off exam table without assistance."  She was not using a walker or cane.  Her liver function tests were very close to normal in January 2002.  Dr. Zolin asked Lucero to continue her phlebotomies on a once-a-month basis until they received the ferritin test results.  Dr. Zolin noted that Lucero would need

phlebotomies for the rest of her life, but the frequency of those procedures was not yet known.  [RP at 206.]

On December 4, 2002, Lucero was seen at the Foot and Ankle clinic.  She reported that her ankle started bothering her about 6 years ago and that she had arthritis.  The pain did not allow her to engage in sport activities.  [RP at 210.]  Dr. Kenneth Johnson's progress note for this date documents Lucero's complaints of left ankle pain caused by arthritis.  Lucero recalled no injury to the ankle.  She had tried anti-inflammatory drugs, arch supports, physical therapy, and cortisone injections, with the latter helping significantly.  Dr. Burney gave her an injection on 11/5/02 which lasted for 7-10 days, but she was feeling worse over time.  Dr. Johnson noted that Lucero was a housewife and incapacitated with pain with respect to work, leisure and sport activities.  Lucero had a difficult time shopping, secondary to pain in her ankle.  Her "review of systems" was positive for "arthritis, joint pain and urinary frequency."  The remaining review was unremarkable.  [RP at 212.]

Dr. Johnson noted that upon examination, Lucero was not in any acute distress.  Her left ankle showed a normal range of motion but there was essentially no motion in her subtalar joint.  In watching her stand, Lucero had basically a normally aligned left foot and ankle.  Previous x-rays showed some kind of abnormality in the area of Lucero's subtalar joint.  Lucero's MRI was remarkable for significant subchondral edema in the area of this joint.  Dr. Johnson felt she probably had tarsal coalition and significant arthritic changes in this joint and the hindfoot.  The appropriate treatment was triple arthrodesis, which the doctor concluded would be a "significant undertaking."  Dr. Johnson gave Lucero an injection that day and scheduled a follow-up appointment in six weeks.  [RP at 212.]

On December 9, 2002, Lucero filled out a Work History Report.  She stated she was working about 10 hours per week.  She sat and wrote 2 hours per day and lifted less than 10 pounds.  [RP at 86.]  On that same date, Lucero saw her therapist again.  The note indicates Lucero was getting acupuncture treatment for her arthritis.  [RP at 277.]

On December 11, 2002, Lucero's DIB application was filed.  [RP at 48.]

### *2003 Medical Records*

On January 6, 2003, the Social Security Administration recommended that Lucero's onset date be changed to March 2002 due to her current work status.  [RP at 103.]  Lucero also saw her counselor again on this date.  She was having marital relationship problems and was also obtaining medication for her arthritis.  [RP at 277.]

On January 15, 2003, Lucero saw Dr. Johnson for complaints of bilateral hindfoot pain.  Dr. Johnson noted again that the basic treatment would be triple arthrodesis.  Lucero had been doing very well with injections into her sinus tarsi.  She was given another injection.  Lucero was afraid of surgery and wanted to postpone it as long as she could.  Dr. Johnson found Lucero's plan reasonable and recommended she return in 6-8 weeks.  [RP at 209.]

On January 16, 2003, Lucero saw Dr. Pacheco for a follow-up appointment related to her complaints of OA of the knees and other areas.  She complained of neck pain.  Lucero had difficulties sleeping at night due to pain.  Dr. Johnson recommended surgery for triple arthrodesis because of tarsal coalition but Lucero was reluctant and wanted a second opinion.  Lucero denied any new complaints and stated she was feeling well.  With respect to Lucero's neck pain, she was to obtain an x-ray to see if she had OA in that location as well.  [RP at 233.]

On January 16, a new x-ray report refers to a "5 view cervical spine series." The report indicates "minimal degenerative changes in the cervical spine." [RP at 234.]

On February 8, 2003, Lucero's best friend filled out a third party daily activities questionnaire for Lucero. [RP at 104.] Catherine Walters stated that Lucero typically volunteered at school and tried to do household chores and cook. Walters said that Lucero used to enjoy sports. Lucero's special hobbies were sports, drawing and reading. Walters said that she had to help Lucero carry packages when Lucero used crutches. It was painful for Lucero to walk. Lucero liked to entertain at home by cooking meals but could no longer do that. Lucero worked at the computer, cleaned and cooked. Cooking caused her the most problem. Lucero was unable to sleep, according to Walters, because of migraines. Lucero got depressed, and Walters believed these problems occurred over the last 6 years. [RP at 106.]

Lucero filled out a headache questionnaire on February 9, 2003. [RP at 107.] She stated that she had headaches four times a day that started in her neck. Her eyes became sensitive to light and loud noises bothered her. The pain in her head felt like she was being crushed. Working at the computer brought on the headaches. When Lucero had these headaches, she had to stop working, and she was also unable to drive. [RP at 107.]

On February 9, Lucero filled out a daily activities questionnaire. She stated that when she woke up she felt like someone "ran over her." She only ate to take her medications in the mornings. But, she was able to get herself and her 6 year old child ready for the day. She worked 2 hours a day but began feeling pain at the end of the 2 hours. Lucero was able to do chores and shopping but she felt dreadful because of the pain. She could barely cook. When Lucero lay down she could not allow the sheets to touch her because of pain. She had crutches to use but they caused her pain. She

thought she might use a wheelchair in the future. [RP at 108.]  She tried to cook a meal three times per week but it was difficult for her.  She was unable to stand or walk for long periods.  No one helped Lucero with the chores, except that her 19-year old vacuumed because Lucero was unable to do it.  Lucero used to love to do yard work but no longer could do it.  Standing to fold clothes was a problem.  Lucero was unable to wash the showers or to clean up after her dogs because of pain in her hands. She shopped four times a week but it was a "horrible" chore.  It was difficult for Lucero to push the shopping cart and she was unable to lift items.  Lucero no longer had any hobbies although she had achieved a red belt in karate and had engaged in other sports previously.  She was unable to take her dogs for a walk.  She read a lot, but it was difficult for her to concentrate due to her medications and their side effects.  [RP at 110.]  Lucero did not have a chance to watch TV but listened to the radio.  Her friend helped take her to medical appointments.  Lucero was never able to sleep through the night because she woke up in pain.  She was able to groom herself but could not apply makeup as she used to apply it due to limitations in standing and sitting, and because of fatigue.  Lucero complained of having less memory and that she became "really depressed" because of pain.  She was unable to walk a block without stopping.  [RP at 114.]  She could walk up the stairs slowly but it was difficult going down.  Putting away groceries was difficult and typing was painful.  She had problems in completing this disability form.  [RP at 117.]

On February 12, 2003, Lucero filled out a pain report.  She described her "first pain" as her foot and ankle pain, that was aching, stabbing, cramping, and throbbing continuously, all day into the night. That pain was severe, and she felt like someone beat her with a baseball bat.  Standing and walking made the pain worse.  Lying down relieved it somewhat.  Lucero took Hydrocodone and Celebrex, which took the edge off her pain but only for 1 hour and not completely.

22

Lucero described her "Second Pain" as her headaches and her neck pain that was aching, stabbing, throbbing 4 times per day, lasting 2 hours. The pain in Lucero's head and neck was exacerbated from sitting at work. If Lucero had to take pain medication, she no longer could work. [RP at 75.]

Lucero's "Third Pain" included her knees and lower hip and back pain [RP at 77], that was aching, cramping, throbbing, crushing, 4 times a day, all day long, if she did not lie down. That pain caused her to stop doing whatever she was doing. She was unable to stand with that pain, and walking made her hip and knee pain worse. Sitting affected Lucero's lower back. The pain medications sometimes helped. The five Hyalgan injections "really helped." Lucero stated that she used crutches to walk because of her   foot and ankle pain. [RP at 79.] Lucero used to do karate, play tennis, go rollerskating and bowl but she was unable to walk now.

On March 25, 2003, Lucero saw Dr. Richard Miller regarding her arthritis. The medical note indicates that Lucero had OA which was particularly affecting her left hindfoot, and that "significantly limit[ed] her in terms of walking activities." She had had 2 injections in the sinus tarsi region which helped somewhat. Lucero had tried a brace, physical therapy, arch supports, but continued to suffer from swelling and could not walk without limping. Lucero was in the process of seeing a new rheumatologist. She apparently had undergone a work-up to see if she had fibromyalgia.[21]  Dr. Miller's physical exam of Lucero showed good ankle range of motion without pain but some pain on her hindfoot inversion. There was mild swelling in that area. The doctor reviewed Lucero's x-ray

---

[21]"Fibromyalgia is a rheumatic disease that is a chronic condition, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue. It is poorly understood and is diagnosed entirely based on patients' reports." Pieratt v. Barnhart, 2005 WL 679089 at *5 (D. Kan. Mar. 24, 2005) (unpublished) (internal citations omitted).

and MRI which showed possible tarsal coalition.  Dr. Miller thought Lucero should see a new rheumatologist.  He wrote Lucero a prescription for an "AFO brace" which she wanted to try.  If the brace did not help, Dr. Miller planned to recommend a CAT scan of Lucero's ankle.  [RP at 270.]

On the same day Lucero saw Dr. Miller, her DIB application was denied.  [RP at 31.]  On March 26, 2003, a Physical RFC Assessment was performed.  The consulting physician found the following limitations: occasional lifting of 10 pounds; frequently lifting of less than 10 pounds, standing or walking for at least 2 hours a day, sitting for 6 hours a day, abilities to push and pull were unlimited.  The assessment documents that Lucero received phlebotomies every three weeks.  However, the physician found that Lucero's "subjective allegations [were] in excess of objective findings."  There were occasional postural limitations but no other limitations recorded by the consulting physician.  [RP at 252.]

On March 27, 2003, the Social Security Administration wrote to Lucero regarding its decision to deny her DIB application.  The SSA concluded that despite Lucero's osteoarthritis, hemochromatosis, frequent phlebotomies and migraines, she could perform her prior work.  [RP at 33.]

On the same date, Lucero was admitted to the Sandia Health System related to a motor vehicle accident she had that day.  She complained of head and neck pain.  [RP at 260.]  A radiology report of Lucero's cervical spine showed degenerative disc disease and OA of the midcervical spine. [RP at 264.]

On March 31, 2003, Lucero filled out a Reconsideration Disability Report, claiming that she still suffered from chronic pain in her back and neck and that the pain was worse.  Lucero had to take more pain management medications and was wearing a prosthetic brace for foot pain.  She suffered

increased dizzy spells because of her pain medications.  Lucero alleged she was unable to sit for more

than 1.5 to 2 hours due to pain.  Her migraines headaches were more frequent.  Lucero stated that she

had to stop working her 10 hour/week job on this date.  She further noted that she was being assessed

for fibromyalgia.  She had had a car accident on 3/27/03 which intensified her arthritis.  [RP at 119.]

On March 31, 2003, Dr. Evanko saw Lucero.  She complained of pain from the car accident

and pain in her neck, head, and feet.  [RP at 269.]  On April 2, 2003, Lucero saw Dr. Evanko again.

His office notes indicate that Lucero became dizzy in the waiting area and that she was suffering from

back and neck joint pain.  [RP at 268.]

On April 4, 2003,  Lucero filled out a Request for Reconsideration, stating that she was in

chronic pain that was not going away due to her arthritis.  She delayed surgery on her foot by wearing

a brace, but she had to quit her job because of chronic pain in her neck, back and hands.

Dr. Evanko saw Lucero on April 8, 2003.  Lucero reported jaw problems but that her head,

neck and pack pain from the accident had improved slightly.  Under "assessment," Dr. Evanko wrote

"fibromyalgia."  [RP at 267.]   On April 22, 2003, Lucero was seen by Dr. Evanko again for an

arthritis "flare-up."  She complained of dizziness and cervical and hip pain.  Even with Oxycontin she

could not sleep.  She described her pain as "very bad."   Lucero woke up 2 to 3 times in the night.

She was so fatigued during the day that she felt like sleeping while driving.  Dr. Evanko increased her

medications.  The medical record notes Lucero was going to see Dr. Erik Carlson for her arthritis.

[RP at 266.]

On April 24, 2003, Lucero had an appointment with Dr. Carlson at the Presbyterian Arthritis

Clinic.  [RP at 306.]  She testified at the ALJ hearing that she had selected Dr. Carlson herself based

on recommendations from people she knew.  Dr. Carlson noted a "problem list" for Lucero that

included:  arthritis associated with total body pain, and cervical radiculopathy.  Lucero was taking

11 different medications, and Carlson changed some of them.  Subjectively, Lucero struggled with

"global total body pain."  Dr. Carlson noted that an aggressive pain management program was not

giving her comfort.  The phlebotomies had not really improved her symptoms.  There had been

concern that Lucero had early RA, and she was prescribed Doxycycline for 3 years without significant

attenuation of those symptoms.  Lucero reported a recent increase of pain associated with the cervical

and lumbar areas.  She had problems with myalgic pain, depression, and fatigue.  Lucero also

complained of problems with knee and ankle pain.  She gave herself scores of 100 for fatigue and

global pain.  In relation to Lucero's ability to perform daily activities, the medical record indicates

that she did the housekeeping, but that she functioned poorly on a scale of 5.  Lucero reported that

walking was difficult for her.  She was applying for disability.  Dr. Carlson observed that Lucero

moved from the chair to exam table and back normally.  [RP at 306.]

On April 28, 2003, the radiology report for Lucero's whole body scan and chest scan

indicated that her lungs were clear.  There was "a little bit systemic osteoarthritic activities."  [RP at

304.]  A May 6, 2003 MRI of her cervical spine indicated "mild spondylosis at C5-6 and C6-7.  The

MRI of Lucero's lumbar spine showed "L4-5 facet arthropathy."  [RP at 299.]

On May 7, 2003, Lucero's counselor, Fritz Frurip, MA, LMFT, wrote a letter on Lucero's

behalf.  He stated that he had been seeing Lucero since October 2001 on a "reasonably consistent

basis" and that he wished to clarify that Lucero's arthritis and medical condition were an "extremely

important thread running through out work."  Her arthritis steadily continued to worsen and there

has been more than enough opportunity for Frurip to witness negative effects on Lucero's mental

health.  He further noted that Lucero's anxiety and depression became difficult for her to manage.

She was vulnerable to suicidal ideation during episodes of experiencing severe pain.  Frurip concluded that Lucero's inability to maintain a sufficient presence in the workforce to assist with family finances and her increasingly curtailed capacity to perform the usual role tasks of wife/mother exacerbated Lucero's depression   The counselor believe that a "favorable ruling" on her DIB application was justified and would "assist in establishing a sense of security whereby her anxiety and depression [would] be better managed."  [RP at 276.]

On May 15, 2003, Lucero was admitted to the hospital for pneumonia.  [RP at 280, 298.] Lucero reported that she had been in her usual state of health until 48 hours ago.  Then she began to sleep a lot during the day, suffered from a low grade fever, and had chest pain with a cough.  The medical record notes that Lucero was  "not very active at home due to her history of diffuse pain syndrome which may be fibromyalgia.  She has some numbness in her arms and states she had a recent MRI of [the] neck which showed a small bulging disk."  She was currently hyperventilating and complained of no feeling in her hands and feet.  Because of Lucero's chronic pain, she was not very active but she did attend to her 6 year-old child.  This record, contrary to earlier medical notes, indicates that Lucero was still working from home as an office manager for an electrical company. The physician concluded that Lucero had probable community-acquired  pneumonia.  However, he was concerned that it could represent a pulmonary embolus with infarct because her pain and her hypoxemia seemed disproportionate to the x-ray findings.  He referred her for more medical tests. [RP at 288-89.]

A May 15, 2003 radiology report noted that a lung ventilation procedure was performed. Another May 15th medical record indicates that Lucero told the doctor "help me help me I am hurting."  Dr. Lieberman noted Lucero's history of chronic pain and that her usual headaches had

increased in severity.  Lucero was impatient with Dr. Lieberman's questions.  She told him that she was to have an MRI of her brain performed.  Dr. Lieberman described Lucero as "distraught, obese, [and] sitting upright at foot of her gurney."  Any strength testing was deferred due to acute pain and "impatience with exam."  [RP at 291.]

On May 16, 2003, Lucero had a spiral CT of the chest because the doctor wanted a definitive view of the lung fields.  [RP at 285.]  X-ray reports from May 16-19, still showed that Lucero had pneumonia.  [RP at 340, 283, 281, 282.]  However, there was no evidence of a thrombus, as suspected by one physician.  [RP at 340.]

On June 5, 2003, Dr. Carlson saw Lucero.  His medical record indicates that the question of reactive arthritis was not "convincingly demonstrated."  It was associated with musculoskeletal pain but no active synovitis.  There were "B7 and 29 aielle positivities, ANA negative."  Lucero's testing for the rheumatoid factor was negative.  She suffered from C5-6, 6-7 and L4-5 discogenic bulging with radiculopathy.  Subjectively, Lucero was struggling with a lot of pain.  She complained of fatigue and stiffness that lasted all day and limited her mobility.  Lucero had  difficulty swallowing and complained of musculoskeletal pain.  Dr. Carlson again noted that Lucero moved from chair to table and back with normal gait and station.  He stated that the bulk of Lucero's pain was "neurogenic from cervical and lumbar discogenic pathology that is below the resolution of surgery but certainly sufficient to cause the symptoms."  [RP at 295-96.]  Dr. Carlson referred her to physical therapy and was going to try a different medication.  He also was sending Lucero to anesthesia to get an epidural block.  Dr. Carlson told Lucero that the "good news" was that she did not need surgery for her discogenic problems; however, the "bad news" was that they could not cure her with a surgical

procedure. Thus, Dr. Carlson concluded that Lucero was going to have "chronic discomfort" from her problems. [RP at 297.]

It appears that Lucero obtained a prescription for a wheelchair in June 2003. [RP at 320.]

On June 20, 2003, Lucero saw Dr. David Woog at Presbyterian's Spine Center. Dr. Woog noted that Lucero's chief complaints were low back and bilateral lower extremity pain, and cervical and right upper extremity pain. He planned to address Lucero's low back and leg pain first and proceed to evaluate her cervical pain. Dr. Woog noted that Lucero walked with an antalgic gait "without laterality as far as a weight bearing effect on pain." She could walk on her heels and toes, but walking on her heels caused her foot and back pain to increase. Based on her recent MRI of the cervical/lumbar spine, Dr. Woog thought it most likely that Lucero's back pain was multifactorial in origin. He noted that Dr. Carlson prescribed physical therapy and that Lucero was to begin that program in a few weeks. Lucero was directed to continue with anti-inflammatory medications. Dr. Woog wanted her to discontinue the Hydrocodone and start Oxycontin. [RP at 330-402.]

On June 24, 2003, Dr. Woog again saw Lucero. He had diagnosed her with bilateral lumbar zygapophyseal[22] arthropathy at L4-5 and L5-S1 levels and gave her an intra-articular lumbar zygapophyseal joint steroid injection. The injection was given both for diagnostic and therapeutic purposes. Dr. Woog hoped that the injections, medical management and physical therapy would regulate Lucero's back and lower extremity pain.

On July 2, 2003, Lucero was seen by a Physician's Assistant for unrelated problems. However, she reported sleeping problems and headache pain and stated she had fibromyalgia. [RP at 333.]

_____

[22]Zygapophysis is defined as "an articular process of a vertebra."

On July 9, 2003, Lucero began seeing Bruce Huyser, Ph.D., a different counselor who worked with Behavior Therapy Associates.  During the intake interview, Lucero reported that her OA was getting worse and that she had associated depression.  She was diagnosed with arthritis 7 years ago. Huyser noted Lucero's comments as follows:  "I try to do things I shouldn't (yard work).  I take on too much.  In wheelchair to go to mall.  It's very hard on my family.  Husband picks up pizza job to pay for co-pays.  I wish I could do more for myself, kids and husband.  They don't complain." Huyser reported Lucero had no suicidal ideation.  [RP at 348-49.]  The intake notes indicate the following jobs for Lucero: "Waitress 7 years, insurance 7 years, stopped after auto accident in 3/03," craps dealer at Sandia (for some illegible period)."  [RP at 349.]  This record also indicates that Lucero's "pain thing started when [she] had [a] falling out with [her] dad ."  [RP at 352.]  This is the only record that shows Lucero reported a prior problem with substance abuse - "cocaine use from 16-25 years; marijuana from 12-25 years."  [RP at 354.]

On July 21, 2003, Huyser saw Lucero again.  The past week for Lucero had gone poorly. She tried to go to grocery store by herself but could not do it and ended up crying.  She felt worthless but denied any suicidal ideation.  Huyser noted moderate improvement in Lucero's depression from the last week.  Lucero was depressed but stable.  She was highly motivated to make changes.  The biggest issue appeared to be Lucero's "go getter" attitude, the corresponding difficulty with self-pacing, and the need to "listen to her body"  Huyser noted that Lucero was still having considerable difficulty adjusting to her illness and the pain-imposed limitations.  [RP at 347.]

On August 12, 2003, the SSA provided an explanation of its denial of Lucero's DIB application.  The agency concluded that Lucero's impairment was severe but not at listing level.  The agency further noted that Lucero had been diagnosed with additional bulging discs and radiculopathy.

However, Lucero moved with a normal gait and station and was able to move onto and off the medical exam table.  Thus, the prior denial of her DIB application was going to be affirmed based, in part, on a finding that Lucero could return to her prior relevant work.  [RP at 123, 32, 39.]

On August 22, 2003, Lucero saw Dr. Miguel Pupiales at Presbyterian's Pain & Spine Clinic. The record notes that Lucero underwent bilateral lumbar L4-5, L5-S1 intra-articular facet steroid injections that were performed on 6/24/03 by Dr. Woog.  Lucero stated that she had absolutely no relief from the injections.  Dr. Woog referred Lucero for an evaluation of a possible epidural steroid injection.  Dr. Pupiales noted that "On review of her history and review of imaging studies, looking at the MRI, just some mild spondylosis, the patient has absolutely no radicular symptoms, no arm pain at all.  Her biggest complaint was neck pain as well as trapezius muscle spasm infrascapular pain." [RP at 400.]  Lucero was diagnosed with zygapophyseal joint syndrome in the cervical area at C4-C5, C5-C6 level.  Dr. Pupiales scheduled Lucero for a bilateral medial branch block trial.

In a letter dated August 29, 2003, Tony McCormick (of the electrical contracting company) described Lucero's prior employment for him.  He stated that he had had the pleasure of employing Lucero from May, 1999 to 4/03.  Lucero started working as McCormick's office manager for 20 hours/week, but she had to decrease her hours as she suffered more illnesses.  According to McCormick, Lucero was unable to sit at computer for the required amount of time due to pain.  By 2003, Lucero could work 10 hours or less because of pain.  Lucero's doctors' appointments interfered with Lucero's work.  McCormick found Lucero very forgetful and inattentive.  He stated that her car accident in March worsened her condition.  While McCormick said that Lucero was a good employee at one time, he found she no longer could serve as his office manager due to her "suffering."  [RP at 127.]

31

On August 31, 2003, Lucero submitted her statement in support of a request for an administrative hearing. She reported that her condition was worse, that she could only sit for 20 minutes at a time and could not sleep even with medication. She was using a wheelchair at times. Her hands were stiff and painful. [RP at 124-26.]

On September 22, 2003, Rick James, another of Lucero's prior employers wrote a letter in her behalf. James stated that he hired Lucero as his office manager in the fall of 1998. Lucero was a very capable and valued. She was an honest and dependable hard worker who did more than was required. Lucero excelled at her position with James. However, after a few years, she started getting ill and complaining of major pain and fatigue regularly. It became obvious to James that Lucero's complaints were "not age-related." Lucero's work level dropped off and she was out absent from work more and more. James understood that Lucero had a legitimate reason to miss work. and he tried to keep her at work but he had to hire an assistant to help Lucero with her work. James determined that he could not keep paying Lucero to do nothing, and he, therefore, let her go due to her deteriorating health. [RP at 128.]

On September 25, 2003, Dr. Evanko filled out a social security Disability Questionnaire on behalf of Lucero. Evanko stated that he first examined Lucero in 1997. The date of her last exam was 9/25/03, although that medical record is not part of the administrative record. She had been diagnosed with hemochromatosis, RA, reactive arthritis, hypothyroidism, and depression. With respect to the administration's request for supporting clinical findings for the diagnoses, Dr. Evanko wrote "see attached". He attached various medical records and x-ray reports, all of which were discussed above and some of which show negative findings, e.g., a negative finding for thyroid deficiencies, a negative finding for RA.

Dr. Evanko concluded that Lucero was "limited significantly by these conditions" in her ability to walk, stand, push, reach, sit, pull, lift, carry, grasp, and engage in fine manipulation. Dr. Evanko checked every box on the form. [RP at 363.] He found that Lucero could lift less than 10 pounds but could not do it occasionally or frequently. Lucero could sit, stand or walk from 0-1 hours a day. She must alternate every 15 minutes between setting and standing. Lucero could occasionally lift 6-10 lbs, 11-20 lbs and nothing over it. She could never use her limbs for repetitive actions. She could not bend, squat, or reach. Lucero could occasionally drive. Dr. Evanko found that Lucero's subjective complaints of pain were consistent with objective findings. He stated that Lucero's mental state had no bearing on her experience of pain. [RP at 364-65.] Lucero's limitations affected all work-related activities. [RP at 366.] Her fatigue and pain affected her ability to function in any work area. Dr. Evanko concluded that Lucero could not do sedentary work and that she was unable to work. Lucero also was unable to ambulate effectively on a sustained basis for 12 months or longer. [RP at 366.] "This patient meets all of these criteria. She should be strongly (underlined) considered for disability benefits." [RP at 367.]

### 2004 Medical Records

On January 21, 2004, Lucero changed primary care physicians from Dr. Evanko to Randal J. Lewis. The record indicates that this was Lucero's initial visit with Dr. Lewis and that she had been with Evanko. Dr. Lewis noted that Lucero "has a complicated history she has RA with chronic pain mostly in neck, hands, and feet. She also has genetic hemochromatosis. She brings her list of medications." Dr. Lewis's assessment was RA. He changed her anti-depressant medication. [RP at 434.]

On February 6, 2004, Lucero was prescribed a wheelchair because of the RA and frequent "painful flares" of the RA to her feet and ankles.  The prescription note states that Lucero was unable to walk during these flares of RA pain.  [RP at 408.]

On the same date, Lucero again saw Dr. Lewis.  She had a cough then and thought she might be pregnant.  She was having a phlebotomy every two months.  Dr. Lewis thought Lucero might have pneumonia and ordered a chest x-ray.  The chest x-ray was normal.  Lucero saw Dr. Lewis for a follow-up visit on February 10 for "post-infection bronchitis."  [RP at 435, 436, 451.]

On March 1, 2004, Dr. Lewis saw Lucero for complaints of nausea, dizziness and fatigue.  She was vomiting initially.  She had been on Methotrexate then for four months.  [RP at 437.]

On March 3, 2004, Lucero's counselor, Bruce Huyser, wrote a letter on Lucero's behalf.  He stated that he had seen Lucero 13 times from July 7, 2003 until January 2004.  A follow-up appointment for March 6 was scheduled, although not many of Lucero's therapy records were made part of the administrative record.  Huyser's letter indicated that the "main focus" was Lucero's considerable chronic pain, secondary to her rheumatic condition.  Lucero also experienced considerable functional limitations as well as other associated consequences, including significant depression, adverse changes in her relationships with friends and family and guilt about her inability to work.  She was not and had not been actively suicidal.  There was some passive suicidal ideation.  Lucero had shown good motivation in therapy.  Her rheumatic condition and associated pain continued to have considerable negative impact on her mood and general psychosocial functioning.  [RP at 409.]

On March 8, 2004, Lucero attended the administrative law hearing before Judge Connor.  Lucero was represented by a non-attorney.  [RP at 455.]  The beginning portion of the hearing was

34

devoted to a discussion of Lucero's onset date, and it was agreed that Lucero's representative would submit a letter setting forth a revised onset date

Lucero testified that she started doing physical therapy for her condition, but that with arthritis, a deteriorating disease, she was in chronic pain.  Then Lucero suffered a car accident which exacerbated her condition.  She stated that in April (2003), she passed out during a phlebotomy, which she described as being a problem she was having with hemochromatosis.  Lucero also said she had passed out at the driving wheel when she had the car accident in April 2003 [RP at 457].   The accident made her symptoms 100 times worse.  [RP at 466.]

Lucero was currently having phlebotomies done every two months.  [RP at 467.]  The ALJ asked Lucero if she had symptoms from the hemochromatosis.  Lucero responded that "they" think Lucero's arthritis is acute at her age because of the hemochromatosis.  She explained that the condition causes one to so much iron in your system that "you become like a statute."  She also believed her condition caused her extreme fatigue.  [RP at 467-68.]

The ALJ noted that as of June 2003, Lucero's MRI did not show evidence of disc protrusion and that the results of that test did not support the limitations Lucero contended she had.  [RP at 469.]  Lucero did not respond directly to the ALJ's statement, but explained that the doctors wanted to perform an epidural and then to go in to "burn the nerve endings."   Lucero explained that she had decided against this treatment because after obtaining two second opinions, the doctors told her that the nerve endings would eventually grow back at her age thereby requiring another procedure.  [RP at 469.]  The ALJ discussed further the "high radio frequency" procedure that involves going into the facets where the nerves are and injecting Lidocaine and Cortisone.  Lucero again stated that because of her age, she would have to have the procedure done more than once or actually "throughout her

life." [RP at 470.] She stated that Dr. Evanko had told her this. Lucero also testified that another family practice doctor (the one who diagnosed her with hemochromatosis) also had told her she would require multiple procedures. Lucero testified that the doctors "did not like that procedure" and that it scared her because of the possibility of paralysis. [RP at 471.]

Lucero acknowledged that she had only tried one epidural but contended that it had not helped at all. [RP at 472.] The ALJ suggested that her own familiarity with these treatments was such that she knew that the first "go-around" did not always have a long lasting effect. The ALJ noted that sometimes people go through two to three injections before it provides significant relief. Lucero contended that her doctors did not want to do another epidural since the first injection did not help her. [RP at 472.]

With respect to her ability to engage in activities, Lucero testified that she could not do what she used to do, and was not able to do everything with her 7 year old that she had hoped she could do. She also stated that she had tried physical therapy but it had not helped. Pool therapy, for example, really aggravated Lucero's upper neck so she stopped physical therapy. [RP at 477.] She was unable to ride a stationary bike because it aggravated her back.

Regarding Lucero's restrictions, she said she was not supposed to walk at all. [RP at 482.] According to Lucero, she understood that the longer she did not walk, the more she could save her ankle. She was hoping for an ankle replacement if they would do it. At this point in the hearing, Lucero wished to show the ALJ her hands so that the judge could observe the swelling on Lucero's knuckles or joints. She testified that she could not type with her hands and could not do household chores because of pain in her. Lucero complained of migraine headaches that incapacitated her. She

suffered a migraine headache every three weeks.  She felt very fatigued which made her want to lie

down during the day, but even lying down was painful.  [RP at 487.]

    The ALJ did not have a VE testify at the hearing.  After the hearing, Lucero had an attorney

submit a letter suggesting an onset date of August 2001.  [RP at 169.]

    On March 31, 2004, Lewis was seen by a nurse practitioner probably with Dr. Lewis' office.

She complained of a possible urinary tract infection and fatigue.   Lucero's prescription for

Methotrexate was changed to a different medicine.  She reported that the B-12 shot had not helped,

that her thyroid functions were "fine," and that had a phlebotomy done about once a month.  Lucero

asked if there was something she could take to give her more energy.  The medical record indicates

that Lucero could not maintain activities of daily living well at all in terms of her functioning.  She

needed a great deal of assistance with house work and shopping.  Lucero used "smart carts" and

wheelchairs to shop.  She limited her exercise and activity in accordance with what she could tolerate.

Lucero was unable to do water exercise and unable to walk.  She tried stationary bike riding but it

hurt her lower back.  The health care provider observed that Lucero was able to get on and off the

exam table without assistance and that her walking was stable.  [RP at 438.]

    On June 21, 2004, Lucero saw Dr. Lewis for complaints of fatigue during the past few

months.  She stated that she was facing extra stress but nothing she had not faced before.  Lucero had

had more lab work done by new hematologist, and the results showed her liver profile was normal.

Dr. Lewis increased Lucero's anti-depressant medications.  [RP at 440.]

    On June 30, 2004, Lewis saw Dr. Woog from the Pain and Spine Center.  Her chief complaint

was headaches and "right sided cervical pain, bilateral upper extremity pain."  The diagnoses were

cervical degenerative disc disease, cervical facet arthropathy, cervical spondylosis at C5-6 and C6-7.

Dr. Woog performed a radio frequency neurotomy for facet mediated pain on Lucero's right side. This was performed for sustained pain control.  He noted that Lucero had undergone a cervical block trial on June 22, 2004 (there is no corresponding medical record), and that she exhibited a concurrent decrease in cervical pain and headaches for the duration of the local anesthetic.  Lucero exhibited pain in multiple areas but subjectively noted relief in those areas.  [RP at 432.]

Lucero saw Dr. Lewis on July 7, 2004 regarding her anti-depressant prescription.  She felt the Lexapro and increased prescription caused more fatigue.  She wanted to change back to taking Celexa and this was done.  [RP at 441.]

On August 9, 2004, Lucero saw the nurse practitioner again.  Her chief complaint was fatigue that had worsened since March.  Lucero had independently stopped taking Arava thinking it contributed to her fatigue but she did not notice any change after stopping the medication.  She complained that she felt worse.  She felt that her fatigue was particularly profound after eating and particularly worse after eating sugar.  Lucero wondered if she had hypoglycemia and diabetes.  There was no physical exam during this visit, but labs were ordered.  [RP at 442.]

On September 3, 2004, Lucero complained to Dr. Lewis regarding he continuing fatigue.  She stated that she "conked out" every day at 2 p.m. and slept for 3 hours.  Lucero's glucose test came back "slightly abnormal."  She had lost a little weight on the low sugar diet and was down to 176 pounds.  Dr. Lewis injected 4 different sites in Lucero's trapezi both left and right.  [RP at 443.]

On September 27, 2004, Dr. Carlson saw Lucero.  His notes show that Lucero had not tolerated the Methotrexate due to side effects relating to fatigue.  Lucero's fatigue was "global" and her pain level was "10 across the board."  However, Dr. Carlson again observed that Lucero moved independently from chair to examining table and to the waste basket.  Dr. Carlson felt that the best

strategy for Lucero was to "re-challenge herself with the Arava.  He noted that Lucero had stopped that medication believing she had a bladder or yeast infection.  Instead, it was determined that Lucero just had an overactive bladder.  Dr. Carlson had no new recommendations for management of Lucero's discogenic disease.  He noted that it was certainly a major part of her chronic pain syndrome, but that he would leave that for the pain management specialist.  Dr. Carlson also concluded that Lucero did not have surgical pathology.  To the extent Lucero had reactive arthritis, it was possible that Arava could help her.  [RP at 431.]

On October 22, 2004, Judge Connor issued an adverse decision, denying Lucero's request for DIB benefits.  The ALJ made the determination at step four of the sequential process having determined that Lucero was able to return to her prior relevant work as she described performing that work.  [RP at 16.]  In so finding, the ALJ did not use the testimony of a vocational expert.

## Lucero's Motion

In this appeal, Lucero argues that the ALJ erred in the following ways: (1) the RFC assessment was not supported by substantial evidence because the ALJ improperly discounted a treating physician's opinions; (2) the ALJ failed to make detailed findings at step four of the sequential process; and/or (3) the ALJ's assessments regarding Lucero's pain and credibility were not supported by substantial evidence.  [Doc. No. 8, p. 1.]  In Lucero's reply brief, she emphasizes one portion of her earlier arguments, i.e, that the ALJ erroneously failed to make clear that she considered lay testimony consisting of Lucero's two employers' letters.

The Commissioner's response did not respond to the latter argument.  However, the Commissioner claims generally that the ALJ properly and fairly determined that Lucero was not entitled to DIB benefits because Lucero failed to meet her burden of proving that she was precluded

from performing her past relevant work for the required 12 continuous months during the adjudicated period of August 2001-October 22, 2004.  [Doc. No. 9, p. 16.]  Thus, the Commissioner argues that substantial record evidence supports the ALJ's final decision and that the ALJ applied the correct legal standards in evaluating the evidence.

<u>**Analysis**</u>

At first glance, the ALJ's analysis appears well-reasoned and correct.[23]  However,  a detailed examination of Lucero's voluminous medical records convinces the Court that "the record as a whole [does not] contain substantial evidence to support the Commissioner's decision."   More specifically, the Court decides that substantial evidence does not support the ALJ's step four findings or her credibility findings.  However, in so concluding, the Court does not improperly substitute its own judgment for that of the ALJ, nor does it suggest the belief that Lucero is disabled under the SSA and/or entitled to benefits.  Instead, the Court remands for a rehearing so that the ALJ may make adequate step four findings, including a consideration of the three prong test set out in <u>Luna v. Bowen</u>, 834 F.2d 161 (10th Cir. 1987), with respect to Lucero's allegations of pain and fatigue.

Briefly stated, the administrative record in this case, even though clearly incomplete, documents literally dozens of diagnoses and medical conditions or complaints, Lucero's visits to at least thirteen different physicians and specialists, prescriptions to numerous medications, including

---

[23]For the most part, the ALJ's written decision accurately records some of Lucero's medical conditions and limitations.  However, the Court notes a few inaccuracies or omissions in the opinion which are not surprising in light of this large and confusing record. For example, the judge noted that there was no evidence of chronic pain that interfered with Plaintiff's ability to ambulate.  Yet, there is evidence of her use of crutches and finally a prescription for a wheelchair.  While these devices may have been used infrequently, it is clear that, at times, Lucero was unable to ambulate without assistance.  Similarly, the medical record is confusing with respect to statements by Lucero that she was able to work out, exercise at the gym, ride an incumbent bicycle, and work a paper route, while needing almost weekly doctor or therapy appointments and medical testing at times.

several narcotic pain killers and a variety of anti-depressant medications, and many different types of treatment.

The Court recognizes that the ALJ considered some of those impairments and diagnoses. For example, Judge Connor found that Lucero had diagnoses of: (1) osteoarthritis; (2) C5-6, C6-7, and L4-5 disc bulging with radiculopathy; (3) hemochromatosis; (4) migraine headaches; and (5) depression. [RP at 20.] The ALJ's decision further discussed "mild spondylosis" at C5-6 and C6-7 and facet degenerative changes at L4-5 and minimally at L5-S1. The ALJ stated that there is "no evidence of . . . chronic joint pain and stiffness of claimant's knees and ankles, resulting in an inability to ambulate effectively." [RP at 21.] Judge Connor found that Lucero's MRI "is consistent with osteoarthritis" and that there was some narrowing of the posterior facet of the subtalar joint. [RP at 21.] The judge found Lucero had a history of migraine headaches and that she "suffers with depression."

Notwithstanding the many conditions and impairments considered in the ALJ's written decision, the judge includes only a portion of the findings and diagnoses given by various doctors. The administrative record documents the following diagnoses and medical problems: (1) cervical spondylosis [RP at 397]; (2) degenerative disc disease [RP at 264]; (3) cervical facet arthropathy [RP at 299, 432]; (4) migraine headaches [RP at 63, 197, 214]; (5) foot pain [RP at 197]; (6) gall bladder surgery [RP at 197]; (7) fatigue [RP at 182, 188, 190, 197, 248, 363]; (8) chronic ankle and leg pain [RP at 197]; (9) appendectomy [RP at 197]; (10) knee collapse and "locking up" even after arthroscopic surgery [RP at 197, 228, 229, 230]; (11) pain, stiffness, fatigue [RP at 197]; (12) "popping" in hip [RP at 197]; (12) numbness in arm [RP at 197]; (13) dizziness [RP at 182, 197]; (14) arthralgia (joint pain) [RP at 190, 198, 250]; (15) depression, coldness, dry hands/feet [RP at

188, 190]; (16) rheumatoid arthritis [RP at 188, 190]; (17) hemochromatosis [RP at 206]; (18) myalgia [RP at 250]; (19) pain in shoulder, ankles, hips [RP at 62, 182, 248, 250]; (20) night sweats, nocturia [RP at 194, 250]; (21) Heberden's nodes [RP at 250]; (22) bilateral shoulder pain [RP at 184, 248, 400]; (23) Bouchard's nodes [RP at 184]; (24) rotator cuff tendinitis [RP at 249]; (25) carpal tunnel syndrome [RP at 248]; (26) finger numbness [RP at 249]; (27) pain in trapezius; (28) hot flashes [RP at 182]; (30) neck muscle pain [RP at 182, 268]; (31) bone and joint pain [RP at 180, 219]; (32) ankle bone spurs [RP at 197]; (33) swollen ankles [RP at 197]; (34) myofascial pain [RP at 236]; (35) flexor tenosynovitis [RP at 236]; (36) subchondral edema; (37) headaches [RP at 107]; (38) sensitivity to light with migraines; (39) fibromyalgia [RP at 220, 267]; (40) anxiety, depression, suicidal ideation [RP at 306, 409]; (41) bilateral zygapophyseal joint syndrome [RP at 327, 400]; (42) hypothyroidism [RP at 188]; (43) cervical facet arthropathy [RP at 306]; (44) recommended triple arthrodesis [RP at 233]; (45) osteochondral irregularity [RP at 242]. The ALJ considered some of these diagnoses, and not others. *See* discussion *infra*.

In addition, while the ALJ briefly references prescription medications that Lucero tried, e.g., muscle relaxers, Oxycontin (for pain), sleep medication, and psychotropic medications, this Court observes that Lucero is close to a walking drug store. The following is a partial listing of medications Lucero was taking at times and/or treatment she received: (1) Oxycontin [RP at 266, 330, 400]; (2) antidepressants, including Lexapro, Trazadone, and Celexa [RP at 197, 266, 441]; (3) Ibuprofen; (4) Vioxx and "Colchicne" [RP at 68]; (5) Celebrex [RP at 72]; (6) B-27 injections; (7) Flexeril [RP at 244]; (8) steroid injections [RP at 248]; (9) Prednisone [RP at 273]; (10) Hyalgan injections [RP at 72, 241]; (11) Butalbital [RP at 68]; (12) Hydrocodone [RP at 68]; (13) Doxycycline [RP at 68, 306]; (14) Methotrexate [RP at 429, 437]; (15) Arava [RP at 431]; (16) B-12 shots [RP at 438]; (17)

regular phlebotomies [RP at 205]; (18) epicondylar injections; (19) thyroid medication [RP at 184]; (20) radio-frequency neurotomy [RP at 432]; chiropractic treatment [RP at 194]; and physical therapy [RP at 210, 250].  Lucero took some of the drugs for months, and some for years.  She tried some of the treatments briefly, others repeatedly.

In addition, as stated previously, Lucero was seen by numerous physicians and specialists on many occasions, including (1) Dr. Erik Carlson; (2)  Dr. Lieberman; (3) Dr. David Woog; (4) Dr. Michael Pupiales; (5) Dr. Mark Evanko; (6) Dr. Randal Lewis; (7) Dr. Dwight Burney; (8) Dr. Larry Pacheco; (9) Dr. Joseph Perea; (10) Dr. Douglas Clark; (11) Dr. William Zolin; (12) Dr. Kenneth Johnson; and (13) Dr. Richard Miller.  In addition, she saw therapists Bruce Huyser and Fritz Frurip.

## I.    STEP FOUR FINDINGS:

Step four of the sequential evaluation process involves three steps.  Doyal, 331 F.3d at 760. First, the ALJ evaluates the claimant's physical and mental RFC.  Second, the judge determines the physical and mental demands of the claimant's past relevant work.  Third, the ALJ decides whether the claimant has the ability to meet the demands of her prior work despite the mental and/or physical limitations found.  Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1999).  At each step, the ALJ must make specific findings.  Id.

At step four, Lucero bears the burden of showing that her medical impairments prevent her from performing her prior relevant work.  But, the ALJ has a duty of inquiry and factual development.  Henrie v. U.S. Dept. of Health & Human Serv., 13 F.3d 359, 361 (10th Cir. 1993). Moreover, the ALJ is required to make specific and detailed predicate findings concerning Lucero's RFC, the physical and mental demands of the past relevant work, and how those demands mesh with the particular claimant's limitations, both exertional and non-exertional.  *See* Social Security Ruling

("SSR") 96-8p, 1996 WL 374184, SSR 82-62, 1982 WL 31386.  As part of the ALJ's step four

analysis, the judge must also "discuss the individual's ability to perform sustained work activities in

an ordinary work setting on a regular and continuing basis. . . ."  SSR 96-8p.

In addition, the Tenth Circuit Court of Appeals explained that:

> RFC is an administrative finding of what an individual can still do
> despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a).  It
> assesses the extent to which an individual's impairment(s) and any
> related symptoms, such as pain, may cause physical and mental
> limitations that affect what [an individual] can do in a work setting.
> Id.  The Social Security Administration regulations clearly state that
> where an individual has more than one impairment, "we will consider
> all of [the] impairment(s) of which we are aware."  Id.  More
> specifically, the regulations state that when a claimant has a severe
> impairment, but the symptoms, signs, and laboratory findings do not
> meet or equal those of a listed impairment in the regulation's
> appendix, the ALJ nevertheless "will consider the limiting effects of all
> . . . impairment(s), even those that are not severe, in determining . . .
> residual functional capacity."  Id. § 404.1545(e).

Spicer v. Barnhart, 64 Fed. Appx. 173, 175 (10th Cir. May 5, 2003) (unpublished opinion).[24]  In

Spicer, the Tenth Circuit noted that while the mere diagnosis of an impairment does not necessarily

compel a finding of disability, the ALJ is required to at least consider a demonstrated impairment

throughout the disability determination process.  Id. at 177.

After noting some of Lucero's severe impairments (osteoarthritis, C5-6, C6-7 and L4-5 disc

bulging with radiculopathy, hemochromatosis, migraine headaches, and depression), the ALJ

determined that none of the impairments, either alone or together, met a listing.  Thus, the ALJ

proceeded to determine Lucero's RFC.

---

[24]The Court recognizes that unpublished opinions are not binding.  Rather, it cites to them for their
persuasive value.

The ALJ considered and commented on a number of Lucero's medical records and test results. [RP at 21-23.]  In so doing, the judge properly discounted treating physician Dr. Evanko's opinion [RP at 23].  The Court agrees with the ALJ's assessment of Dr. Evanko's opinion.  Even though characterized as Lucero's treating physician, only a few of Dr. Evanko's progress notes are part of the administrative record.  The ALJ observed that Dr. Evanko neither provided the results of clinical evaluations that would support Lucero's complaints nor demonstrated that he conducted any recent clinical exams of Lucero.  As support for Dr. Evanko's opinions (set forth in the medical questionnaire), Dr. Evanko simply referred to attached medical records of other physicians who saw Lucero, which the ALJ also noted.  As the ALJ appropriately observed, some of the results attached by Dr. Evanko were not consistent with his opinion.  Moreover, Dr. Evanko did not provide specific supporting objective medical evidence for all of his opinions.  Thus, the Court determines that substantial evidence supports the ALJ's finding that Dr. Evanko's opinions were of little assistance and entitled to limit weight, as stated by Judge Connor.  [RP at 23.]  *Compare* Robinson v. Barnhart, No. CIV 02-644 (10th Cir. Apr. 6, 2004) (finding ALJ failed to give sufficient explanation for rejecting treating physician's opinion).

The ALJ decided that Lucero "has the RFC to perform sedentary work activity.  She can lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand/walk at least two hours . . .; sit about six hours in an 8-hour workday; and occasionally climb, balance, stoop, kneel, crouch and crawl."  [RP at 24.]  Judge Connor then determined that Lucero's description of daily activities was not inconsistent with the RFC the judge assessed.  [RP at 24.]

The Court is unable to conclude that substantial evidence supports the ALJ's RFC finding.  This is true because the record is replete, as indicated above, with reported diagnoses, medical

conditions and impairments. The ALJ's decision, while thoughtful and well-reasoned, does not demonstrate that the ALJ considered, as she must, all of Lucero's impairments, even those that were not severe. For example, the ALJ gave little credence to the effects of Lucero's hemochromatosis and the regular phlebotomies that she is required to undergo, other than to note none of Lucero's target organs were affected. Yet, one article included in the record stated that "crushing fatigue" was one of the most common complaints related to that condition. Moreover, one of Lucero's physicians observed that Lucero's history of hemochromatosis "would probably" make her cartilage more brittle and more susceptible to developing problems [RP at 244], thereby possibly accounting for Lucero's numerous complaints of joint pain.

Judge Connor discussed some of Lucero's complaints regarding various body pain and aches, her migraine headaches and depression. However, there was little specific discussion by the ALJ regarding Plaintiff's numerous other complaints and/or diagnoses of numbness, dizziness, Heberden's nodes, Bouchard's nodes, subchondral edema, fibromyalgia, suicidal ideation and anxiety, bilateral zygapophyseal joint syndrome, etc.

The ALJ noted that laboratory testing for rheumatoid arthritis was negative, and yet a 2004 medical record indicates that Lucero's doctor prescribed a wheelchair that Lucero sometimes had to use because of rheumatoid arthritis and the frequent related painful "flares" to her feet and ankles. [RP at 408.] Moreover, while Judge Connor discussed 2001 medical findings that showed no significant pain in Lucero's range of motion at the shoulders, 2004 medical records indicate that Lucero complained of bilateral upper extremity pain and was receiving radio frequency neurotomy for purposes of sustained pain control. [RP at 432.]

The ALJ may not pick and choose particular entries or portions of entries in a medical record to support her ruling, and instead, must consider the record as a whole. Schwarz v. Barnhart, 70 Fed. Appx. 512, 518 (10th Cir. Jul. 16, 2003) (unpublished) (internal citation omitted).  To the extent that further development of the record was required, it is the ALJ who has the "duty of inquiry and factual development."  Moreover, if information from a treating medical source (i.e., PCP Evanko)[25] is inadequate to determine if the claimant is disabled, an ALJ is required to recontact the medical source, including a treating physician, to determine if additional needed information is readily available.  20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1).

In sum, the Court concludes that substantial evidence does not support the ALJ's RFC finding.  Thus, the case will be remanded for rehearing so that the ALJ can reconsider Lucero's RFC, including her "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis," in light of all of Lucero's documented diagnoses, medical conditions, treatments and limitations.

## II.   CREDIBILITY DETERMINATIONS:

The Court also determines that remand is proper so that the ALJ can reconsider Lucero's credibility at the rehearing.  Judge Connor found that Lucero's allegations regarding her symptoms and restrictions were not supported overall to the disabling degree alleged, and therefore, lacked credibility.  [RP at 21.]  The ALJ appeared to discount *in toto* Lucero's steady and frequent complaints of pain and fatigue, after finding "[Lucero's] complaints of pain" to be in excess of

---

[25]For example, in this case, it is clear that not all of Evanko's progress notes or medical records for Lucero are included.

objective medical findings.[26] [RP at 24.] The judge further discounted Lucero's complaints of fatigue based on Lucero's failure to mention how long her fatigue lasted. [RP at 24.]

The Court recognizes that credibility determinations "are peculiarly the province of the finder of fact," and are not to be upset if supported by substantial evidence. Kepler v. Chater, 68 F.3d 387, 390-91 (10th Cir. 1995). However, when assessing credibility, the ALJ must consider the three prong test set out in Luna v. Bowen: (1) did the claimant establish a pain-producing impairment by objective medical evidence; (2) if so, was there a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, considering all of the evidence, both objective and subjective, was the claimant's pain, in fact, disabling. Musgrave v. Sullivan, 966 F.2d 1371, 1376 (10th Cir. 1992) (internal citation omitted). The "ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain testimony is critical." Kepler, 68 F.3d at 391 (internal citation omitted).

In deciding whether the claimant's pain is disabling, the ALJ should consider the following factors: location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medication; treatment, other than medication, for pain relief; functional restrictions; and plaintiff's daily activities." Southard v. Barnhart, 72 Fed. Appx. 781, 783 (10th Cir. Jul 28, 2003) (unpublished opinion) (citing 20 C.F.R. pt. 404, subpart P, app. 1; 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3)); Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988). "It [is] error for the ALJ to fail to expressly consider claimant's

---

[26]While the agency's consultative physician made this same observation without the benefit of examining Lucero, none of the numerous other examining physicians indicated that Lucero exaggerated her complaints or that they found her lacking in credibility. Indeed, Dr. Carlson noted that the bulk of Lucero's pain was "neurogenic from cervical and lumbar discogenic pathology that is below the resolution of surgery but certainly sufficient to cause the symptoms [fatigue, stiffness all day, limited mobility, difficulty swallowing, a lot of pain]." [RP at 296.]

persistent attempts to find relief from [her] pain, [her] willingness to try various treatments for [her] pain, and [her] frequent contact with physicians concerning [her] pain-related complaints." Hardman v. Barnhart, 362 F.3d 676, 680 (10th Cir. 2004) (internal citations omitted).

Judge Connor addressed some of Lucero's complaints of pain and fatigue in her written decision, and she also considered some of the medications and treatments that Lucero received. [RP at 22.]  However, Judge Connor selectively noted from the medical record and Lucero's testimony that Lucero had received only one set of epidural injections in her spine "and never went back for more."[27]  [RP at 22.]  While that may be true, there are other medical records demonstrating that Lucero went to the doctor repeatedly for other types of steroid injections with respect to complaints of pain in various parts of her body.  The ALJ also commented that Lucero's treatments included anti-inflammatory drugs, arch supports, physical therapy, and cortisone shots, "which helped her significantly."   Again, there are other medical records, along with Lucero's own testimony, documenting her assertions that many of the medications and treatments were not helpful for long. See, e.g., RP 75, 210, 241, 270, 278, 297, 306, 400.

Judge Connor found that Lucero's complaints of fatigue lacked credibility apparently because Lucero failed to mention how long her fatigue lasted.  [RP at 23.]  However, a careful examination of the medical records indicates that Lucero often complained of severe or extreme fatigue during her many, many visits to doctors. See, e.g., RP at 180, 182, 186, 190, 194, 197, 250, 266, 306, 431, 437,

---

[27]At the hearing, the ALJ appeared to rely on her own understanding and experience of this type of treatment and what she believed to be a proper amount of time to determine effectiveness of the procedure.  [RP at 472].  This is improper.  In addition, the ALJ's determination about this one treatment may have led to her statement in the written opinion that "it should be noted that the claimant has given up and has not tried all available therapies for her medical condition."  [RP at 24.]  Based on the extensive medical record, it cannot be disputed that Lucero tried many of the available therapies.  With respect to Lucero's decision not to undergo complicated foot/ankle surgery, the treating physician believed her decision to be a reasonable one.

440-43, 467, 487.  Thus, it might be easily inferred that Lucero's fatigue was fairly constant, even if Lucero did not describe the condition as lasting a certain number of days or months.

In reaching her RFC and related credibility findings, the ALJ properly considered Lucero's description of daily activities, but the Court finds that the ALJ overstated those activities.  For example, the ALJ's decision notes that Lucero:

> is able to take care of her personal needs, shops four times a week, volunteers to help with activities once a week in her daughter's kindergarten class, reads, drives, cleans house, does the laundry but has difficulty standing to fold the clothes, takes daughter to and from school, watches football and basketball games, prepares meals, draws, visits with family and best friend, does the banking and pays the bills.

[RP at 23.]

The ALJ's description of Lucero's daily activities fails to note that over recent years, Lucero started to work out of her own home and reduced her hours of work as office manager due to pain, fatigue and various medical problems.  Lucero testified at the hearing, that she finally stopped her part-time work because work was too painful.  [RP at 464.]  She further stated that she could not type because of pain or swelling in her hands.  She was unable to perform household chores because of her hands.  [RP at 484.]

Lucero described waking up feeling like someone had run over her.  [RP at 108.]  She was able to get herself and her child ready for the day but said that doing chores and shopping were "dreadful" because of pain.  Lucero stated that she could barely cook, and that when she lied down, she could not allow the sheets to touch her because of pain.  She had used crutches but found them too painful to use as of 2003.  [RP at 108.]  She attempted to cook three meals per week but it was "hard."  She shopped four times a week but it was a "horrible chore."  She had a difficult time in

50

pushing the cart and lifting grocery items.  She read a lot but it was difficult to concentrate because of medications.  Her friends took her to doctors' appointments.

Later medical records indicate that Lucero suffered from fatigue and stiffness that lasted all day and limited her mobility.  [RP at 295.]  By July 2003, Lucero stated that she used a wheelchair to go to the shopping mall.  [RP at 348.]  Also in July 2003, Lucero reported to here therapist that she had tried to go grocery shopping alone but could not do it.  [RP at 347.]  In February 2004, Lucero was prescribed a wheelchair.  [RP at 408, 435.]  In March 2004, Lucero reported that she used "smart cars and wheelchairs" in shopping and needed a great deal of assistance with house work and shopping.  [RP at 438.]

The Court concludes that the ALJ's credibility findings are contradicted by medical record and/or not supported by substantial evidence.  Thus, the Court remands for further evaluation of Lucero's credibility and the related evidence in light of the Luna factors.  In particular, the ALJ should consider the frequency and duration of Lucero's complaints and conditions, Lucero's attempts to find relief from her pain, and the many different medical treatments prescribed for Lucero's conditions, along with their effectiveness.

At the rehearing, the Court also suggests that a vocational expert be used to assist in the determination of whether Lucero's documented diagnoses and medical conditions preclude her from returning to her prior relevant work and sustaining employment in that position or in any position.  To the extent that the ALJ determines that more information is required from Lucero's PCP, she should attempt to obtain that information.  If the ALJ decides that a consultative medical examination would be helpful, the ALJ should direct that such exam be performed.

In addition, in analyzing the third <u>Luna</u> factor, the ALJ should consider the two written statements [RP at 127, 128] submitted by Lucero's former employers that indicate they did not believe Lucero was able to perform the job duties of an office manager.  While the ALJ is not required to discuss every piece of evidence, the two supervisors' statements regarding their observations of Lucero's ability to perform prior relevant work is particularly relevant to the ALJ's determination that Lucero could perform the very work that her employers stated she could not perform.

Because the ALJ did not mention those employer statements in reaching her non-disability determination, it is not clear whether she considered the statements.   Under Social Security regulations, the agency may use evidence from non-medical sources to assess the severity of a claimant's impairments and how the impairments affect the claimant's ability to work.  20 C.F.R. §§ 404.913(d), 404.1513(d).   Similarly, the ALJ may also decide to consider Lucero's counselors' opinions or records regarding Lucero's ability to perform and sustain work.  *See also* SSR 82-62, 1982 WL 31386 (1982) (determination of claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met . . .; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases supplementary or corroborative information for other sources such as employers . . . .)

The Court is not suggesting the weight the ALJ should give such opinions.  That is for the ALJ to decide and explain.  Rather, the Court merely observes that the ALJ "must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as the significantly probative evidence [she] rejects."

**Conclusion**

The Court will remand for a rehearing on the issues discussed above, having concluded  that substantial evidence does not support the ALJ's RFC finding and credibility findings.  Upon remand, the ALJ must evaluate Lucero's RFC in light of all of the medical evidence and make appropriate detailed findings.  In addition, with respect to the ALJ's credibility determinations, the ALJ must affirmatively link those credibility conclusions to the evidence and address all significantly probative evidence supporting Lucero's allegations.  The ALJ shall evaluate Lucero's allegations of pain and fatigue in accordance with the proper legal standard, as set forth in <u>Luna</u>, and make specific evidentiary findings regarding Lucero's subjective complaints, taking into account her consistent attempts to obtain medical treatment and her use of prescriptions and other treatments for her conditions.

IT IS THEREFORE ORDERED that Plaintiff's motion to remand for rehearing [Doc. No. 7] is GRANTED and that this matter shall be remanded to that court, with instructions to the secretary to remand for further proceedings consistent with this opinion.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge